**LOWENSTEIN SANDLER PC**
S. Jason Teele, Esq.
Sharon L. Levine, Esq.
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

-and-

65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)
*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MK Network, LLC, *et al.*,[1]<br><br>　　　　　　　　　Debtors. | Chapter 11<br>(Joint Administration Requested)<br><br>Case No. 11-10859 |

**AFFIDAVIT PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**
**AND IN SUPPORT OF THE DEBTORS' PETITIONS AND FIRST DAY MOTIONS**

　　　**JOSEPH DAVIS**, pursuant to 28 U.S.C. § 1746, declares as follows:

---

[1]　　　The Debtors are: (i) MK Network, LLC and its subsidiaries: MedKnowledge Group, LLC; TCL Institute LLC; Insight Interactive Network LLC; MedKnowledge Communications LLC; InteliMed Communications LLC; MK Global Communications LLC; PharMediCom LLC; MES Communications LLC; Center for Health Care Education LLC; Medfinance LLC; Chester Education Group LLC; and, The Center for Medical Knowledge LLC (collectively, the "**MK Network Debtors**"); and, (ii) Meridian Behavioral Health LLC and its subsidiaries: Avalon Programs LLC; Alliance Clinic LLC; Cedar Ridge Treatment Center LLC; Meadow Creek LLC; Odyssey Programs LLC; Tapestry Treatment Center LLC; and, Twin Town Treatment Center LLC (collectively, the "**Meridian Debtors**" and together with the MK Network Debtors, collectively, the "**Debtors**").

1. I am a member of the manager of (i) MK Network, LLC and its subsidiaries: MedKnowledge Group, LLC; TCL Institute LLC; Insight Interactive Network LLC; MedKnowledge Communications LLC; InteliMed Communications LLC; MK Global Communications LLC; PharMediCom LLC; MES Communications LLC; Center for Health Care Education LLC; Medfinance LLC; Chester Education Group LLC; and, The Center for Medical Knowledge LLC (collectively, the "**MK Network Debtors**"); and, (ii) Meridian Behavioral Health LLC and its subsidiaries: Avalon Programs LLC; Alliance Clinic LLC; Cedar Ridge Treatment Center LLC; Meadow Creek LLC; Odyssey Programs LLC; Tapestry Treatment Center LLC; and, Twin Town Treatment Center LLC (collectively, the "**Meridian Debtors**" and together with the MK Network Debtors, collectively, the "**Debtors**").

2. This Affidavit (the "**Affidavit**") is being submitted (a) pursuant to Rule 1007-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**") and (b) in support of the relief requested in the motions (each, a "**First Day Motion**" and, collectively, the "**First Day Motions**") which have been or will be filed with the Court in connection with the commencement of these chapter 11 cases Except as otherwise indicated herein, all facts set forth in this Affidavit are based upon my personal knowledge of the Debtors' operations and finances and information gathered from a review of relevant documents, or provided to me by other members of the Debtors' management.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents or my opinion based upon my experience, knowledge and information concerning the Debtors' finances and operations. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

4. Part I of this Affidavit sets forth the information required by Local Rule 1007-2(a) regarding the nature of the Debtors' businesses and a concise statement of the circumstances leading to the commencement of these chapter 11 cases. Several schedules are attached to this Affidavit, which provide additional information required by Local Rule 1007-2(a).

5. Part II of this Affidavit describes the First Day Motions. I have reviewed the

relief sought in each First Day Motion and believe the relief requested therein is necessary to enable the Debtors to continue to operate in chapter 11 and to permit the Debtors to successfully reorganize and maintain the value of their assets and businesses. Accordingly, for the reasons set forth herein, I believe the relief sought in the First Day Motions is in the best interests of the Debtors, their estates, creditors, and other parties in interest in these cases.

**PART I**
**NATURE OF THE DEBTORS' BUSINESSES AND CIRCUMSTANCES LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES**

**A.    In General.**

6.    On the date hereof (the "**Petition Date**"), each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

7.    The Debtors intend to operate their businesses and manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

8.    I am advised by the Debtors' bankruptcy counsel that this Court has jurisdiction over these chapter 11 cases pursuant to 28 U.S.C. §§ 157 and that venue of these cases and the First Day Motions is proper in the United States Bankruptcy Court for the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409.

9.    In order to enable the Debtors to effectively transition to chapter 11 and to minimize the effects of the chapter 11 filings, the Debtors have requested various types of relief in the First Day Motions filed, or which will be filed, with this Court.  The relief sought in the First Day Motions is limited to that which is essential to allow the Debtors to transition to chapter 11.

**B.    Nature of the Debtors' Business.**

10.    MK Network, LLC is a medical communications and continuing medical education company. The MK Network Debtors' medical communication services assist pharmaceutical and biotechnology brand teams with educating healthcare professionals on the features, benefits and appropriate prescribing of drugs. In addition, the MK Network Debtors offer continuing medical education opportunities to physicians and nurses.

11.    The MK Network Debtors collectively employ approximately 47 persons and

have a monthly payroll of approximately $270,000.00.

12.     Meridian Behavioral Health Network LLC is the largest for-profit behavioral healthcare company in Minnesota. The Meridian Debtors offer a comprehensive array of outpatient, jail based, residential mental health and substance abuse services to men, women and pregnant women. The Meridian Debtors operate drug, alcohol and mental rehabilitation facilities and programs throughout Minnesota.

13.     The Meridian Debtors collectively employ approximately 220 persons and have a monthly payroll of approximately $700,000.00.

**C.    Pre-Petition Indebtedness And Capital Structure.**

**i.    Secured Debt**

14.     The MK Network Debtors' liabilities include a secured credit facility in the approximate aggregate amount of $15,972,642.92 evidenced by a Credit Agreement among the Meridian Debtors and Fifth Street Finance Corporation ("**Fifth Street Finance Corp.**") dated as of December 1, 2008, as amended on various dates (the "**Prepetition MK Network Credit Agreement**"). Each of the MK Network Debtors are borrowers under the Prepetition MK Network Credit Agreement and substantially all of their assets are pledged as collateral for their obligations thereunder.

15.     The Meridian Debtors' liabilities include a secured credit facility in the approximate aggregate amount of $4,844,534.77 evidenced by a Credit Agreement among the Meridian Debtors and Fifth Street Mezzanine Partners II, L.P. ("**Fifth Street Mezzanine Partners,** and, together with Fifth Street Finance Corp., "**Fifth Street**") dated as of January 1, 2007, as amended on various dates (the "**Prepetition Meridian Credit Agreement**"). Each of the Meridian Debtors are borrowers under the Prepetition Meridian Credit Agreement and substantially all of their assets are pledged as collateral for their obligations thereunder.

**ii.    Unsecured Indebtedness.**

16.     As of the Petition Date, the Debtors collectively have approximately $750,000.00 in outstanding obligations to trade creditors and other vendors. The MK Network

Debtors' unsecured debt totaled approximately $4,515,000.00 on the Petition Date, and the Meridian Debtors' unsecured debt totaled approximately $3,117,000.00 on the Petition Date.

        **iii.**     **Equity.**

17.     MK Network LLC is the sole member of MedKnowledge Group, LLC and TCL Institute LLC. MedKnowledge Group, LLC is the sole member of Insight Interactive Network LLC, MedKnowledge Communications LLC, InteliMed Communications LLC, MK Global Communications LLC, PharMediCom LLC, and MES Communications LLC. TCL is the sole member of Center for Health Care Education LLC and The Center for Medical Knowledge LLC. The membership interests of MK Networks LLC are owned by MK Investors, LLC, a special purpose vehicle of Triton Pacific Capital Partners, and Fifth Street Capital, The Customer Link, Inc., CHCE and Insight Interactive.

18.     Meridian Behavioral Health, LLC is the sole member of each of the Meridian Debtors. The membership interests of Meridian Behavioral Health, LLC is owned by Meridian Investors, LLC, a Triton Pacific Capital Partners special purpose vehicle, and Fifth Street Capital, Michael Bundy, Paul Cowdery, David Gnass, and E. Larry Atkins.

**D.**     **Events Leading To The Chapter 11 Case.**

19.     The Meridian Debtors are operationally and financially sound. These Debtors have strong accounts receivable and ample liquidity. The Meridian Debtors' facilities are currently operating at greater than 90% census. While the Meridian Debtors are current in all of their payment obligations to Fifth Street, Fifth Street has noticed several alleged covenant defaults and has threatened to take precipitous action, including sweeping the Meridian Debtors' bank accounts, which would destroy their operations, and foreclosing on its collateral.

20.     The MK Network Debtors are also operationally sound, but are in need of financial restructuring due to a general decline in their business over the past several quarters. These Debtors' financial difficulties caused them to miss monthly interest payments due to Fifth Street in each month since September 2010, as well as the quarterly principal payments due to Fifth Street in October 2010 and January 2011. The MK Network Debtors have been aggressively seeking to

rehabilitate their operations and restructure their debts outside of bankruptcy.

21.     In each case, the MK Network Debtors and the Meridian Debtors have been engaged in active negotiations with Fifth Street over the terms of a financial restructuring. While the negotiations were continuing, on February 25, 2011, Fifth Street abruptly provided the Debtors with a notice of default and issued instructions to the Debtors' banks to not honor any checks or process any transfers from the Debtors' accounts.  This action has effectively shut down the Debtors' operations, including, without limitation, the Debtors' ability to satisfy employee obligations.  Since the notices of default were served, the Debtors continued to seek a resolution with Fifth Street, but no resolution was possible.

22.     Accordingly, the Debtors took the unfortunate but necessary step of filing their voluntary petitions to protect their business and preserve the value of their assets.

23.     Through these chapter 11 cases, the Debtors intend to rehabilitate their businesses, deleverage their balance sheets and increase liquidity to satisfy the claims of Fifth Street, vendors and other creditors under a plan of reorganization that promotes the Debtors' business plan and complies with the applicable provisions of the Bankruptcy Code.

**E.     Other Information Required Pursuant To Local Bankruptcy Rule 1007-2.**

24.     Pursuant to Local Bankruptcy Rule 1007-2(a)(3), to the best of my knowledge, information and belief, no committee was formed prior to the order for relief in these chapter 11 cases.

25.     Pursuant to Local Bankruptcy Rule 1007-2(a)(4), **Schedule 1** includes a list of the names, addresses and, where available, telephone numbers, of the creditors of the Debtors holding the consolidated twenty largest unsecured claims.  Such list includes the amount of the claim, the nature of the claim (*i.e.*, trade debt, real property leases, etc.) and, if appropriate, an indication of whether such claim is contingent, unliquidated, disputed or partially secured.

26.     Pursuant to Local Bankruptcy Rule 1007-2(a)(5), **Schedule 2** includes a list of the names and addresses of the Debtors' secured creditors. This list includes the amount of each claim, a brief description of the collateral securing the claim.

27.     Pursuant to Local Bankruptcy Rule 1007-2(a)(6), **Schedule 3** includes a summary of the assets and liabilities of the Debtors.

28.     No shares of stock, debentures or other securities of the Debtors are publicly held. Accordingly, I am advised by counsel that Local Bankruptcy Rule 1007-2(a)(7) is inapplicable in these cases.

29.     Pursuant to Local Bankruptcy Rule 1007-2(a)(8), to the best of my knowledge, information and belief, the Debtors do not have any property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity.

30.     Pursuant to Local Bankruptcy Rule 1007-2(a)(9), **Schedule 4** lists all of the Debtors' leased premises. The Debtors do not own any real property.

31.     Pursuant to Rule 1007-2(a)(10), the location of the Debtors' substantial assets, including furniture, fixtures, equipment, and other personal property is 550 Main Street, New Brighton, MN 55112 (Meridian Debtors) and 2080 Silas Deane Highway, Rocky Hill, CT 6067 (MK Network Debtors). The Debtors' books and records are also located at these locations.

32.     Pursuant to Rule 1007-2(a)(11), to the best of my knowledge, information and belief, other than these chapter 11 cases, the Debtors are not a party to any pending actions.

33.     Pursuant to Rule 1007-2(a)(12), **Schedule 5** includes the names of the individuals who comprise the Debtors' existing senior management.

34.     Pursuant to Rule 1007-2(b)(1), the estimated gross amount of payroll obligations to employees of the Debtors (exclusive of officers, directors and members) for the thirty (30) day period following the commencement of the Debtors' chapter 11 cases is approximately $970,000.00.

35.     Pursuant to Rule 1007(b)(2), **Schedule 6** includes the amounts that will be paid to the Debtors' officers, stockholders, members and financial or business consultants for services for the thirty (30) day period following the commencement of the Debtors' chapter 11 cases.

36.     Pursuant to Rule 1007-2(b)(3), **Schedule 7** includes the Debtors' projected 13-week cash flow.

## PART II
## FACTS IN SUPPORT OF FIRST DAY MOTIONS

37.     The Debtors filed the First Day Motions concurrently with the filing of their chapter 11 petitions. The Debtors request that each of the First Day Motions be granted, as each constitutes a critical element in achieving a successful and smooth transition to chapter 11.

38.     For a more detailed description of the First Day Motions, the Debtors respectfully refer the Court to the respective First Day Motions. To the extent that this Affidavit and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motions shall control.

**A.     Debtor's Motion For Interim And Final Orders Under Section 105, 361, 362 And 363 Of The Bankruptcy Code Approving The Use Of Cash Collateral, Providing Adequate Protection And Setting A Final Hearing Pursuant To Bankruptcy Rule 4001 (the "Cash Collateral Motion").**

39.     As stated above, the Debtors are indebted to Fifth Street in the aggregate amount of approximately $20,817,177.69.  Without the immediate use of Fifth Street's cash collateral (the "**Cash Collateral**"), the Debtors will be unable to pay salaries, rent, utilities and other operating expenses incurred in the ordinary course of business and may be forced to cease operations and terminate over two hundred sixty (260) employees.  Thus, the Debtors' ability to preserve and maximize the value of their assets for all creditors (secured and unsecured) will be critically impaired, and their ability to reorganize, will be substantially jeopardized absent authority to use the Cash Collateral.  Accordingly, the Debtors seek the entry of an interim, and subsequently a final, order authorizing the use of the Cash Collateral pursuant to the budget annexed to the Cash Collateral Motion as Exhibit A (the "**Cash Collateral Budget**"), subject to a variance equal to the greater of ten percent (10%) of the expenses set forth in the Cash Collateral Budget.  To the extent amounts set forth in the Cash Collateral Budget are not used in a given period, they may be spent in any subsequent period(s).

40.     Through the use of Cash Collateral, the Debtors will be able to maintain their

operations as going concerns while protecting, preserving and maximizing the value of their assets for all creditors including the Secured Creditors. In order to adequately protect the Secured Creditors' rights, the Debtors propose to grant the Secured Creditors replacement liens on all of the Debtors' postpetition assets to the extent of any diminution in the value of the prepetition collateral.

41.     The Debtors submit that the proposed replacement liens will adequately protect the Secured Creditors within the meaning of section 361 of the Bankruptcy Code and maintain that they should be authorized to use the Cash Collateral in accordance with the Cash Collateral Budget.

**B.      Motion For An Order Pursuant To 11 U.S.C. §§ 105(a), 363(c), 345(c) And 1107  (I) Authorizing The Debtor To Continue Using Its Existing Cash Management   System, Bank Accounts And Business Forms, (II) Granting An Interim And    Final   Waiver Of The Deposit Guidelines Set Forth In 11 U.S.C. § 345 And (III) Granting Related Relief (the "Cash Management Motion").**

42.     Prior to the Petition Date, as part of their ordinary business practices, the Debtors maintained approximately twenty-seven (27) bank accounts in five (5) banks, a cash management system, business forms and checks. The Debtors do not currently have any investment accounts.

43.     To avoid disruption to the ordinary and usual cash management and day-to-day operations of the Debtors, and to ensure an orderly transition into chapter 11, the Debtors respectfully request an order authorizing the Debtors to continue to use their existing bank accounts, cash management system, checks, and business forms.

44.     The Debtors also request that the banks at which the Debtors maintain their existing accounts be entitled to receive payment of both prepetition and postpetition services and other fees, costs, charges, and expenses to which such banks may be entitled under the terms of, and in accordance with, their contractual arrangements with the Debtors.

45.     Accordingly, through the Cash Collateral Motion, the Debtors seek entry of an order pursuant to sections 105, 362(a), 363(c)(1), 1107 and 1108 of the Bankruptcy Code:

a.      authorizing the Debtors, on the terms set forth in the Cash Management Motion, to continue to consolidate the

management of their cash if and as necessary, without interruption in the ordinary course of business;

b.      directing that the banks at which the Debtors maintain accounts (the "**Cash Management Banks**") are stayed from offsetting, affecting or otherwise impeding the use or transfer of or access to any funds, contained or deposited in the bank accounts, from all bank accounts which are utilized in the Debtors' day-to-day operations (collectively, the "**Accounts**," a list of which is set forth on <u>Exhibit A</u> to the Cash Management Motion) on or subsequent to the commencement of these chapter 11 cases for any reason or on account of any claim (as defined in section 101(5) of the Bankruptcy Code) of the Cash Management Banks;

c.      directing the Cash Management Banks to transfer, in accordance with prepetition practices, or at the request and direction of the Debtors, any funds in the Accounts to the extent set forth herein;

d.      authorizing the Debtors to maintain and continue to use, with the same account numbers, the Accounts maintained with the Cash Management Banks, and directing that all such Accounts be treated for all purposes as Accounts of the Debtors as debtors in possession;

e.      authorizing and directing the Cash Management Banks to service and administer the Accounts without interruption and in the usual and ordinary course, and to receive, process, honor and pay any and all checks and drafts drawn on the Accounts, whether presented, drawn or issued before or after the Petition Date for payment by the holders or makers thereof, for any obligations of the Debtors for which payment is authorized by Court Order, provided that sufficient funds exist, whether deposited prior or subsequent to the commencement of the Debtors' chapter 11 cases, to cover such checks upon presentment;

f.      granting a waiver of the investment and depository guidelines of section 345 of the Bankruptcy Code; and

g.      authorizing the Debtors to use, in their present form, existing checks and other documents, including their existing business forms, relating to the Accounts, <u>provided</u>, <u>however</u>, that the Debtors shall add a "DIP" designation to their existing checks and other business forms.

**i.      <u>Cash Management System.</u>**

46.     The Debtors submit that the nature of their financial affairs, coupled with the inherent delay and harm to the Debtors' estates and their creditors that would result if the Debtors were forced to discontinue their current cash management system, warrants the continuation of the Debtors' current cash management system.  Specifically, the time and expense required to discontinue the Debtors' current cash management system and implement new systems would result in a wasting of assets of the estates.  Moreover, the commencement of the Debtors' chapter 11 cases will undoubtedly place a substantial strain on the Debtors' relationships with their vendors, consultants, contractors and suppliers -- relationships that are vital to the Debtors' continued operations, which are necessary to the Debtors achieving a successful resolution of these chapter 11 cases.  Requiring the Debtors to open new debtor-in-possession bank accounts in substitution for their existing accounts would cause delay, confusion, and disruption to the Debtors' operations, further straining these relationships.

47.     Prior to the Petition Date and in the ordinary course of business, the Debtors maintained Accounts at City National Bank in Beverly Hills, CA;  Highland Bank in St. Paul, MN;  Wells Fargo Bank in Bloomington, MN;  RBC in Cary, NC and Rocky Mount, NC; and, People's Bank in Bridgeport, CT.

48.     Receipts from the Debtors' operations are deposited into one of the foregoing Accounts.  Funds are then transferred between or from these Accounts to pay Employees, vendors and other creditors.

49.     One of the Accounts at Highland Bank is set up as a "concentration account" and funds from the other Accounts at Highland Bank are swept into the Highland Bank concentration Account each evening.

50.     Similarly, one of the Accounts at Wells Fargo Bank is set up as a "concentration account" and funds from the other Accounts at Wells Fargo Bank are swept into the Wells Fargo Bank concentration Account each evening.

**ii.     The Debtors' Business Forms.**

51.     The Debtors should be permitted to continue to use their existing business

forms, including their existing check stock. A certain amount of time and expense would be required to print and obtain new checks and other forms. Notwithstanding the foregoing, the Debtors will stamp the legend "Debtor-In-Possession" or "DIP" on substantially all business forms utilized after the Petition Date.

### iii. Compliance with Section 345 Guidelines.

52. The Debtors do not currently have any investment accounts. However, to the extent applicable during the pendency of these bankruptcy cases, the Debtors submit that sufficient cause exists to permit a waiver of the depository requirements articulated in section 345 of Bankruptcy Code.

53. Requiring the Debtors to issue a bond in favor of the United States or to deposit securities, as section 345(b) requires, would cause substantial unnecessary expense to these estates. Granting a waiver of the requirements of section 345 of the Bankruptcy Code will facilitate a smooth and orderly transition of the Debtors' businesses into chapter 11 and minimize the disruption of this transition.

**C. Debtor's Motion For Order Pursuant To 11 U.S.C. §§ 105(a), 507(a)(4) And (5) (I) Authorizing The Debtor To Pay Prepetition Wages, Salaries And Other Compensation And Related Taxes, (II) Authorizing The Debtor To Honor Workers' Compensation Obligations And To Continue Prepetition Employee Welfare Programs, And (III) Directing All Banks To Honor Prepetition Checks For Payment Of Prepetition Employee Obligations (the "<u>Wage</u> <u>Motion</u>").**

54. The Debtors employ approximately 267 employees (the "**<u>Employees</u>**"). The MK Network Debtors employ 43 full time employees and at least 1 part time employee. The Meridian Debtors employ approximately 220 full-time employees and at least one temporary employee. The MK Network Debtors and Meridian Debtors also employ three and five, respectively, independent contractors that work on-site substantially all of the time.

55. The Employees' continued and uninterrupted service is essential to the Debtors' reorganization. To minimize the personal hardship the Employees will suffer if prepetition employee-related obligations are not paid when due, and to maintain the Employees' morale during this critical time, the Debtors seek authority to (i) pay all prepetition Employee claims for wages,

salaries and other accrued compensation and related taxes up to the statutory cap of $11,725 per employee, (ii) make all payments for which Employee payroll deductions were made, (iii) reimburse all prepetition Employee business expenses, (iv) make prepetition contributions and pay benefits under certain employee benefit plans, (v) honor workers' compensation obligations, (vi) pay other miscellaneous, employee-related costs, (vii) continue prepetition programs with respect to vacation, sick, personal and holiday leave and continue certain health, welfare, savings and other benefit programs as described more fully below (collectively, the "**Employee Obligations**").

56. The Debtors also (i) request that the Court authorize and direct applicable banks and other financial institutions to receive, process, honor and pay all prepetition checks and transfers drawn on the Debtors' accounts related to the Employee Obligations and (ii) seek authority to pay all processing costs and administrative expenses related to the foregoing payments.

### Summary of Prepetition Employee Obligations

#### i.     Wages, Salaries and Other Compensation.

57. The MK Network Debtors pay their employees located in Connecticut on a semi-monthly basis and their employees in North Carolina on a bi-weekly basis. The MK Network Debtors' average semi-monthly payroll is approximately $120,000 (net of all related payroll taxes). One employee is paid on an hourly basis. The MK Network Debtors use the services of Automatic Data Processing, Inc and PrimePay to calculate and issue the Employees' paychecks and direct deposits. Payroll for the MK Network Debtors' Employee for the week of February 20, 2011, through and including February 25, 2011 has been paid with the exception of the one hourly employee. The MK Network Debtors may have accrued wages for the week of February 28, 2011.[2]

58. The Meridian Debtors pay their employees on a bi-weekly basis. The Meridian Debtors average bi-weekly payroll is approximately $243,000 (net of all related payroll

---

[2]     The MK Network Debtors scheduled the payment of the last payroll through their payroll service provider, however, Fifth Street's efforts to freeze the Debtors' bank accounts may have resulted in this payroll not being paid. Confirmation has been hampered by the fact that the Debtors have no access to their bank accounts as a result of Fifth Street's actions. To the extent this payroll has not been paid, the Debtors seek to pay it through the authority sought in the Wage Motion.

taxes).  The Meridian Debtors may have accrued prepetition wages for the week of February 20, 2011.[3]

59.     As of the Petition Date, the Debtors' outstanding payroll obligations may total approximately $363,000.00 (the "**Prepetition Wages**").  To the extent any such obligations are later determined to be due and owing, the Debtors request authority to pay such expenses in the ordinary course of business upon notice to the Office of the United States Trustee.

### ii.     Withholding Obligations.

60.      The Debtors routinely withhold from Employee wages certain amounts that the Debtors are required to transmit to third parties for such purposes as Social Security, Medicare, federal and state income taxes, Health and Welfare Plan (as defined below) contributions, defined contribution retirement plan contributions, payroll deduction payment programs for various optional insurance programs, loan payments, union dues, garnishments, and child support and other similar orders (the "**Withholding Obligations**"). The Debtors believe that such withheld funds, to the extent that they remain in the Debtors' possession, are not property of the Debtors' bankruptcy estates.

### iii.     Vacations, Sick, Personal and Holiday Leave.

61.     In the ordinary course of business, and as is customary with most companies, the Debtors maintain various employee benefit plans and policies for the benefit of their Employees that provide such persons with vacation, holidays, sick time, and similar benefits (collectively, the "**Employee Benefits**").  Employees generally are not entitled to a cash payout for the Employee Benefits.  The Debtors anticipate that their Employees will utilize any accrued Employee Benefits without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations.  To the extent any such obligations are later determined to be due and owing, the

---

[3]     The Meridian Debtors scheduled the payment of the last payroll through their payroll service provider, however, Fifth Street's efforts to freeze the Debtors' bank accounts may have resulted in this payroll not being paid. Confirmation has been hampered by the fact that the Debtors have no access to their bank accounts as a result of Fifth Street's actions.  To the extent this payroll has not been paid, the Debtors seek to pay it through the authority sought in the Wage Motion.

Debtors request authority to pay such expenses in the ordinary course of business upon notice to the Office of the United States Trustee.

62.     The MK Network Debtors maintain a paid time off policy that does not permit employees to carry over paid time off from one year to the next or compensate employees for any accrued but unused pay time off.

63.     The Debtors anticipates that its Employees will utilize any accrued Employee Benefits in the ordinary course.

### iv.     Reimbursable Business Expenses.

64.     In the ordinary course of the Debtors' business, Employees may incur a variety of business expenses that are typically reimbursed by the Debtors pursuant to its normal business practices.  Employees travel regularly as part of their duties.  The reimbursable business expenses incurred by the Employees include business travel, business meals, car rentals, delivery expenses and miscellaneous related expenses (collectively, the "**Reimbursable Business Expenses**").  All Reimbursable Business Expenses were incurred with the understanding that they would be reimbursed by the Debtor.  As of the Petition Date, the Debtors estimate that there are approximately $25,000 unreimbursed Reimbursable Business Expenses.  The Debtors do not believe that any individual Employee has incurred Reimbursable Business Expenses in excess of $1,000.  To the extent any such obligations to any individual Employee exceed $1,000, the Debtors request authority to pay such expenses in the ordinary course of business upon notice to the Office of the United States Trustee.

### v.     Insurance Benefits.

65.     In the ordinary course of their business, the Debtors provide medical and dental insurance to their eligible Employees through group plans offered by Aetna, Guardian, Horizon Blue Cross/Blue Shield of Minnesota and Delta Dental provide Employees with certain insurance programs including life, disability, medical and health and dental (collectively, the "**Health Benefits**").  Eligible Employees are also entitled to participate in the Debtors' life and disability insurance programs offered by (the "**Life Insurance**" and, collectively with the Health

Benefits, the "**Insurance** **Benefits**").  The Debtors' average monthly cost for the Insurance Benefits is approximately $105,000 before contributions from employees.

66.     Many of the Insurance Benefits are either partially or fully funded through Employee contributions.  Other Insurance Benefits are fully insured with premiums paid by the Debtors or the Employees.  Because of the manner in which expenses are incurred and claims are processed under the Insurance Benefits, it is difficult for the Debtors to determine the extent of obligations under the Health and Welfare Plans outstanding at any particular time. As of the Petition Date, the Debtors estimate they were current in their Insurance Benefits obligations.  To the extent any such obligations are later determined to be due and owing, the Debtors request authority to pay such expenses in the ordinary course of business upon notice to the Office of the United States Trustee.

### vi.     Savings Plan.

67.     The MK Network Debtors and the Meridian Debtors each maintain a defined savings plan for its Employees, which is qualified under section 401(k) of the Internal Revenue Code (the "**Savings** **Plan**").  Pursuant to the Savings Plan, the Debtors deduct the appropriate amounts from each participating Employee's payroll check and transfers the withheld funds to the plan trustee.  The Debtors are current in their  obligations under the Savings Plan.

### vii.     Other Benefits.

68.     The Debtors offer eligible Employee the opportunity to participate in its Health Saving Account.  There is no cost to the Debtors for this program.  Each eligible participating Employee elects to deduct an amount from their payroll check.    By this Motion, the Debtors seek an order authoring, but not directing them to pay all amounts to and owing as of the Petition Date and to continue such benefit post petition.

### viii.     Workers' Compensation Obligations.

69.     The Debtors are required under applicable law to maintain workers' compensation insurance policies and programs to provide Employees with workers' compensation coverage for claims arising from or related to their employment with the Debtor.

70.     The Debtors maintain workers' compensation liabilities as required by the

local laws of the jurisdictions in which they operate. As of the Petition Date, the Debtors were current with its workers' compensation obligations. To the extent any such obligations are later determined to be due and owing, the Debtors request authority to pay such expenses in the ordinary course of business upon notice to the Office of the United States Trustee.

**Authority for Banks to Honor and/or Reissue Checks**

71.     The Debtors further request that all applicable banks and other financial institutions be authorized to receive, process, honor and pay any and all check and transfers drawn on the Debtors' dedicated payroll accounts, whether such checks were presented before, on, or after the Petition Date. Accordingly, by this Motion, the Debtors seek (i) authorization for, and/or ratification of, their banks' honoring of prepetition payroll checks and transfers on or after the Petition Date, (ii) authorization for the banks to process and honor all other checks issued for payments approved by this Motion, and (iii) authorization to reissue checks for payments approved by this Motion whenever a check therefore is dishonored post petition.

D.      **Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 366 for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Discontinuing, Altering, or Refusing Service on Account of Prepetition Invoices, (II) Deeming Utility Companies To Have Adequate Assurance of Future Payment, and (III) Establishing Procedures For Resolving Requests for Additional Assurance ("Utilities Motion").**

72.     By the Utilities Motion, the Debtors seek entry of interim and final orders, pursuant to sections 105(a) and 366 of the Bankruptcy Code, (a) prohibiting Utility Companies from discontinuing, altering or refusing service to the Debtors on account of prepetition invoices, (b) deeming Utility Companies to have adequate assurance of future performance on the basis of payment of a security deposit (the "**Utility Deposit**") and (c) establishing procedures for resolving requests for additional adequate assurance of future payments.

73.     While all of the Debtors' facilities are leased from third parties, the Debtors are responsible for utility services at all locations. Specifically in the operation of their businesses, the Debtors incur utility expenses for water, sewer service, electricity, gas, telephone service and internet service in the ordinary course of business. These utility services are provided by several utility providers (as such term is used in section 366 of the Bankruptcy Code, collectively, the

"**Utility Providers**"), including those listed on **Exhibit C** attached to the Utilities Motion.[4] On average, the Debtors spend approximately $43,000 each month on utility costs at their facilities, and the Debtors believe they generally were current on utility payments as of the Petition Date.

74.     Uninterrupted utility services are essential to the continuation of Debtors' on-going operations and to the success of the Debtors' chapter 11 efforts. The Debtors' operations will be negatively impacted if one or more Utility Company refuses or discontinues utility services for even a brief period of time. Accordingly, any interruption of utility services, even for a brief period of time, would negatively impact the Debtors' customer relationships, revenues and profits, seriously jeopardizing the Debtors' reorganization efforts and, ultimately, value and creditor recoveries. It is, therefore, critical that utility services continue uninterrupted during these Chapter 11 cases.

### Adequate Assurance Of Payment

75.     Section 366 of the Bankruptcy Code prohibits a utility company from altering, refusing or discontinuing its service to a chapter 11 debtor within the first thirty (30) days of the bankruptcy filing (the "**Utilities Stay Period**"). Upon expiration of the Utilities Stay Period, section 366(b) of the Bankruptcy Code provides that a utility company may terminate services if the utility company has not received adequate assurance of payment from the debtor.

76.     Adequate assurance of payment, as defined in section 366(c)(1)(A) of the Bankruptcy Code, includes "a cash deposit, a letter of credit, a certificate of deposit, a surety bond, a prepayment of utility consumption or another form of security that is mutually agreed on between the utility and the debtor or trustee." 11 U.S.C. § 366(c)(1)(A).

77.     In accordance with the definition of adequate assurance of payment under

---

[4]     While the Debtors have exercised reasonable efforts to list all of their Utility Companies in **Exhibit C** to the Utilities Motion, it is possible that certain Utility Companies may have been inadvertently omitted from this list. Accordingly, the Debtors reserve the right, pursuant to the terms and conditions of this Motion and without further order of the Court, to amend **Exhibit C** to the Utilities Motion to add any omitted Utility Company and to request that the relief set forth in this Motion apply to such entities. In addition, the Debtors reserve the right to argue that any of the entities now or hereafter listed in **Exhibit C** to the Utilities Motion are not "utilities" within the meaning of section 366(a) of the Bankruptcy Code.

section 366(c)(1)(A) of the Bankruptcy Code, the Debtors propose to provide each Utility Company, as identified on **Exhibit C** to the Utilities Motion, with a Utility Deposit, equivalent to the estimated average value of utility consumption for a two-week period, also identified on **Exhibit C** provided that such Utility Providers provided that such Utility Provider does not already hold a deposit equal to or greater than two weeks of utility services, and provided further that such Utility Provider is not currently paid in advance for its services. The Debtors further propose to issue each Utility Deposit within ten (10) business days after the date of entry of the Final Order granting this Motion.

78.     Additionally, the Debtors seek to establish reasonable procedures (the "**Adequate Assurance Procedures**") by which Utility Companies may request additional adequate assurance of future payment, in the event that a Utility Company believes that the Utility Deposit does not provide them with satisfactory adequate assurance. The Debtors propose the following procedures:

A.     Absent any further order of this Court and except as otherwise provided herein, the Utility Companies may not alter, refuse or discontinue service to, or discriminate against, the Debtors on account of the commencement of these chapter 11 cases or any unpaid prepetition charges, or request payment of an additional deposit or receipt of other security in connection with any unpaid prepetition charges.

B.     The Debtors will serve the Motion and the Interim Order, if granted by the Court, on each Utility Company via first-class mail, within two (2) business days following the entry of the Interim Order. In the event that any Utility Company was omitted from Exhibit C, the Debtors shall have the right to supplement Exhibit C and shall promptly provide notice of the Order upon learning of such Utility Company.

C.     Any Utility Company may request additional assurance of payment (an "**Additional Payment Request**") within thirty (30) days after the date the Motion is filed (the "**Additional Payment Request Deadline**") by submitting the request to counsel to the Debtors, Lowenstein Sandler PC, 1251 Avenue of the Americas, 18th Floor, New York, New York 10020, Attention: S. Jason Teele, Esq.

D.     Any Additional Payment Request must (i) be in writing, (ii) set forth the location for which utility services are provided, (iii) include a summary of the Debtors' payment history relevant to the affected account(s), including any security deposits or other prepayments or assurances previously provided by the Debtors, (iv) describe in sufficient detail the reason(s) why the treatment afforded pursuant to the procedures set forth herein does not

constitute satisfactory adequate assurance of payment, and (v) include a proposal for what would constitute adequate assurance from the Debtors, along with an explanation of why such proposal is reasonable.

E. If a Utility Company makes a timely Additional Payment Request that the Debtors believe is reasonable, the Debtors shall be authorized in their sole discretion to comply with such request without further order of the Court.

F. If the Debtors believe that a Utility Company's Additional Payment Request is unreasonable and the parties are unable to agree, the Debtors will schedule a hearing at the next omnibus hearing date scheduled in these cases (a "**Determination Hearing**") to determine if adequate assurance to such Utility Company is necessary, or if additional assurance as to payment to such Utility Company is necessary.

G. Pending resolution of a Utility Company's Additional Payment Request at a Determination Hearing, such Utility Company shall be prohibited from altering, refusing or discontinuing service to the Debtors.

H. If a Utility Company fails to send an Additional Payment Request by the Additional Payment Request Deadline, such Utility Company shall have waived its right to make an Additional Payment Request and shall be deemed to have received adequate assurance of payment in accordance with §366(c)(1)(A)(vi) by virtue of the Utility Deposit. Utility Companies that do not send Additional Payment Requests to the parties set forth above by the Additional Payment Request Deadline shall be collectively referred to as the "**Consenting Utility Companies**".

I. A Utility Company shall be deemed to have adequate assurance of payment unless and until a future order of this Court is entered requiring further adequate assurance of payment.

## E. Motion for an Order Directing Joint Administration of the Debtors' Chapter 11 Cases ("**Joint Administration Motion**").

79. Through the Joint Administration Motion, the Debtors seek the joint administration of their chapter 11 cases for procedural purposes only. Specifically, the Debtors request that the Court maintain one file and one docket for each of the jointly-administered cases. The Debtors propose to designate the chapter 11 case of MK Network, LLC as the main bankruptcy case.

80. The Debtors also request that a docket entry, substantially similar to the following, be entered on the dockets of the chapter 11 cases of each of the other Debtors to reflect the joint administration of the chapter 11 cases:

An order has been entered in accordance with Rule 1015(b) of the Federal Rules of Bankruptcy Procedure directing the procedural consolidation and joint administration of this chapter 11 case with the affiliated chapter 11 case captioned, *In re MK Network, LLC*. All further docket entries shall be made in Case No. 11-10859 ( ).

81.     Finally, the Debtors seek authority to file the monthly operating reports required by the United States Trustee Operating Guidelines on a consolidated basis, provided that separate allocations of disbursements will be made for each Debtor.

## **CONCLUSION**

82.     For the reasons stated herein and in each of the First Day Pleadings, the relief sought therein is in the best interest of the Debtors, their creditors and the estates, and therefore, on behalf of the Debtors, I respectfully request that the First Day Orders be entered.

I declare under penalty of perjury of the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge, information and belief.

*/s/ Joseph Davis*
Joseph Davis

Dated: February 28, 2011

## Schedule 1

| Name of creditor and complete mailing address, including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, or disputed, or subject to setoff | Amount of claim [if secured, also state value of security] |
|---|---|---|---|---|
| The Customer Link, Inc. c/o TCL Institute 104 Towerview Court Cary, NC 27513 | The Customer Link, Inc. c/o TCL Institute 104 Towerview Court Cary, NC 27513 | Promissory Note | | $3,539,178.08 |
| Triton Pacific Capital Partners, LLC 10877 Wilshire Boulevard 12th Floor Los Angeles, CA 90024 | Triton Pacific Capital Partners, LLC 10877 Wilshire Boulevard 12th Floor Los Angeles, CA 90024 | Unpaid, earned fees | | $1,916,423.00 |
| 1706 University, LLC 2990 Somerset Lane Orono, MN 55356 | 1706 University, LLC 2990 Somerset Lane Orono, MN 55356 | Promissory Note | | $891,733.33 |
| American Express PO Box 360001 Fort Lauderdale, FL 33336-0001 | American Express PO Box 360001 Fort Lauderdale, FL 33336-0001 | Trade Debt | | $178,576.09 |
| Genentech Inc. Independent Medical Education 1 DNA Way, MS 827A South San Francisco, CA 94080 | Genentech Inc. Independent Medical Education 1 DNA Way, MS 827A South San Francisco, CA 94080 | Trade Debt | | $85,000.00 |
| Blue Cross Blue Shield of MN PO Box 64676 St. Paul, MN 55164-0676 | Blue Cross Blue Shield of MN PO Box 64676 St. Paul, MN 55164-0676 | Insurance Premiums | | $83,906.00 |
| FGMK LLC 2801 Lakeside Drive Third Floor Bannockburn, IL 60015-1275 | FGMK LLC 2801 Lakeside Drive Third Floor Bannockburn, IL 60015-1275 (847) 374-0400 | Trade Debt | | $54,215.38 |
| 2080 Realty, LLC c/o Nutmeg Management 3580 Main Street Hartford, CT 06120 | 2080 Realty, LLC c/o Nutmeg Management 3580 Main Street Hartford, CT 06120 | Rental Contract | | $48,250.00 |
| Bristol-Myers Squibb Company Attn: Avagail Morgan J3217 Route 206 & Province Line Road Princeton, NJ 08543 | Bristol-Myers Squibb Company Attn: Avagail Morgan J3217 Route 206 & Province Line Road Princeton, NJ 08543 | Trade Debt | | $42,086.11 |
| Raveling, Lyle 3389 Renaissance Park Place Cary, NC 27513 | Lyle Raveling 3389 Renaissance Park Place Cary, NC 27513 | Trade Debt | | $34,500.00 |
| Gemini 2990 Somerset Lane Orono, MN 55356 | Gemini 2990 Somerset Lane Orono, MN 55356 | Real estate leases | | $31,871.17 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, or disputed, or subject to setoff | Amount of claim [if secured, also state value of security] |
|---|---|---|---|---|
| Medica<br>PO Box 740804<br>Atlanta, GA 30374-0804 | Medica<br>PO Box 740804<br>Atlanta, GA 30374-0804 | Refunds | | $30,920.27 |
| Barton Creek Capital<br>515 Congress Street<br>Suite 1515<br>Austin, TX 78701 | Barton Creek Capital<br>Attn: Keith Buchanan/Justin Metcalf<br>515 Congress Street<br>Suite 1515<br>Austin, TX 78701 | Real estate lease | | $29,028.58 |
| Health Partners<br>Mail Stop Code 21103R<br>PO Box 9463<br>Minneapolis, MN 55401 | Health Partners<br>Mail Stop Code 21103R<br>PO Box 9463<br>Minneapolis, MN 55401 | Refunds | | $26,869.45 |
| Littler Mendelsohn, PC<br>1300 Ids Center<br>80 South 8th Street<br>Minneapolis, MN 55402-2136 | Littler Mendelsohn, PC<br>1300 Ids Center<br>80 South 8th Street<br>Minneapolis, MN 55402-2136 | Trade Debt | | $24,616.50 |
| New Horizon Food Inc.<br>33440 Western Avenue<br>Union City, CA 94587<br>Voice: 510-489-8600<br>Fax: 510-489-9797 | New Horizon Food Inc.<br>33440 Western Avenue<br>Union City, CA 94587<br>Voice: 510-489-8600<br>Fax: 510-489-9797 | Trade Debt | | $24,267.24 |
| Atomic<br>615 North Third Street, #100<br>Minneapolis, MN 55401 | Atomic<br>615 North Third Street, #100<br>Minneapolis, MN 55401 | Trade Debt | | $20,614.09 |
| Advanced Practice Solutions<br>8645 Eagle Point Boulevard N.<br>Lake Elmo, MN 55042 | Advanced Practice Solutions<br>8645 Eagle Point Boulevard<br>Lake Elmo, MN 55042 | Trade Debt | | $19,583.33 |
| Mintz, Levin, Cohn, Ferris, Glovsky<br>3580 Carmel Mountain Road #300<br>San Diego, CA 92130 | Mintz, Levin, Cohn, Ferris, Glovsky<br>3580 Carmel Mountain Road #300<br>San Diego, CA 92130 | Trade Debt | | $19,269.72 |
| Advanced Psychiatric Care PC<br>5851 Duluth Street<br>Golden Valley, MN 55422 | Advanced Psychiatric Care PC<br>5851 Duluth Street<br>Golden Valley, MN 55422 | Trade Debt | | $17,995.00 |

## Schedule 2

| Secured Party | Collateral |
|---|---|
| Fifth Street Finance Corporation | All assets |
| Fifth Street Mezzanine Partners II, L.P. | All assets |
| Anchor Bank | Furniture; lease ends 6/1/11 |
| Anchor Bank | Software upgrade and service; term ends 2/1/11 |
| North Shore Bank | Computers and equipment; term ended 12/31/10 |
| Leaf Funding, Inc. | Cannon Copiers at 9 facilities; term ends 5/1/14 |
| US Express Leasing, Inc. | Phone Equipment; lease ends 5/15/13 |
| US Express Leasing, Inc. | Phone Equipment; lease ends 4/30/13 |
| US Express Leasing, Inc. | Phone Equipment; lease ends 1/30/13 |
| US Express Leasing, Inc. | Phone Equipment; lease ends 4/30/13 |
| US Express Leasing, Inc. | Phone Equipment; lease ends 12/30/12 |
| US Express Leasing, Inc. | Phone Equipment; lease ends 1/30/13 |
| US Express Leasing, Inc. | Phone Equipment; lease ends 4/30/13 |
| US Express Leasing, Inc. | Phone Equipment; lease ends 11/30/12 |
| Thoemke & Sons, LLC | Goods, chattels, fixtures and personal property belonging to Avalon Programs, LLC, which now are or may hereafter be placed in 1885 University Ave, St. Paul, MN 55104 |
| General Security Services Corporation | Security alarm system identified on the Equipment List attached to the Agreement, including transmission boxes and wire connections, and excluding communication lines, necessary to transmit signals from Cedar Ridge, Inc. to GSSCs central station monitoring center |

# Schedule 3

|  | YTD |
| --- | --- |
|  | Current Month |

**ASSETS**

| | |
| --- | ---: |
| Petty Cash | $3,400 |
| Cash | 1,598,057 |
| | -------------------- |
| Total Cash | 1,601,457 |
| | |
| Accounts Receivable | 3,813,640 |
| Allowance for Doubtful Acct. | (2,037,080) |
| | -------------------- |
| Total Accounts Receivable | 1,776,560 |
| | |
| Automobile | 125,753 |
| Less: Accumulated Depreciation - Autos | (41,517) |
| Buildings and Leasehold Improvements | 578,770 |
| Accum Depreciation - Buildings & Leasehold Imp | (66,189) |
| Computers and Equipment | 1,057,296 |
| Accumulated Depreciation - Computers and Equipment | (574,396) |
| Furniture and Fixtures | 243,266 |
| Accumulated Depreciation - Furniture and Fixtures | (112,330) |
| | -------------------- |
| Total Fixed Assets | 1,210,653 |
| | |
| Prepaid Expenses | 132,237 |
| Deposits | 16,790 |
| Employee Advances | 590 |
| Bus Cards | 4,400 |
| Debt Acquisition Cost | 594,214 |
| Less Amortiztion for Debt | (474,081) |
| Finance Costs | 144,553 |
| Accumulated Amortization - Finance Costs | (18,069) |
| Goodwill | 8,942,870 |
| | -------------------- |
| Total Other Assets | 9,343,504 |
| | |
| **TOTAL ASSETS** | **13,932,174** |

|  | YTD |
|---|---|
|  | Current Month |

**LIABILITIES AND STOCKHOLDERS EQUITY**

| | |
|---|---:|
| Accounts Payable | $463,503 |
| Accrued Salaries | 416,646 |
| Accrued Expenses | 787,851 |
| Accrued Bonuses | 70,076 |
| Accrued Union Dues | 4 |
| Accrued Medical Reimbursement | 24,993 |
| Accrued HSA | 300 |
| Accrued Dependent Care | 3,111 |
| Accrued 401K Payable | 1,277 |
| Refunds Payable | 2,170 |
| Deposits Payable | 5,941 |
| MN Care Tax Payable | 43,661 |
| FICA Payable | 67,373 |
| Minnesota Withholding Taxes Payable | 11,888 |
| Wisconsin Withholding Taxes Payable | 3,241 |
| FUTA Payable | 1,529 |
| SUTA Payable | 14,368 |
| | -------------------- |
| Total Current Liabilities | 1,917,932 |
| | |
| Accrued Lease Costs | 619,357 |
| Accrued Mgmt Fees (Triton) | 1,462,923 |
| Accrual for Dividends | 2,471,357 |
| | -------------------- |
| Total Other Liabilities | 4,553,637 |
| | |
| Leases | 101,408 |
| Long Term Note | 4,844,535 |
| Loans Due Sellers | 961,598 |
| | -------------------- |
| Total Long Term Liabilities | 5,907,541 |
| | |
| Common Stock | 5,216 |
| Member's Equity | 6,990,604 |
| Dividends | (2,153,622) |
| Additional Paid In Capital | 694,681 |
| Retained Earnings | (3,502,369) |
| Year to Date Earnings | (481,446) |
| | -------------------- |
| Total Stockholders Equity | 1,553,064 |

**TOTAL LIABILITIES**
**AND STOCKHOLDER'S EQUITY**                    13,932,174
                                         ===========

**MK Network LLC**
**Consolidated Balance Sheet**
**As of December 31, 2010**

|  | Actual | Budget | Variance | Year End 2009 |
|---|---:|---:|---:|---:|
| Cash | 1,110,076 | 2,614,280 | -1,504,204 | 2,294,446 |
| Accounts Receivable | 1,164,405 | 2,022,102 | -857,696 | 3,494,453 |
| Costs & Est Profit in Excess of Billings (MKG) | -156,028 | -49,960 | -106,067 | 250,989 |
| Prepaid Expenses | 55,461 | 33,874 | 21,587 | 52,349 |
| **Total Current Assets** | **2,173,915** | **4,620,295** | **-2,446,380** | **6,092,237** |
|  |  |  |  |  |
| Property, Plant & Equipment (Net) | 226,926 | 264,274 | -37,348 | 344,250 |
| Security Deposits | 7,388 | 9,744 | -2,356 | 5,623 |
| Goodwill & Other Intangible Assets | 24,926,740 | 27,355,835 | -2,429,095 | 25,228,179 |
| **Total Non Current Assets** | **25,161,055** | **27,629,853** | **-2,468,798** | **25,578,052** |
|  |  |  |  |  |
| **TOTAL ASSETS** | **27,334,969** | **32,250,147** | **-4,915,178** | **31,670,289** |
|  |  |  |  |  |
|  |  |  |  |  |
| Accounts Payable | 286,600 | 386,060 | -99,460 | 260,171 |
| Accrued Expenses | 165,954 | 665,783 | -499,829 | 406,880 |
| Accrued Commissions & Severance(TCL) | 135,000 | 0 | 135,000 | 0 |
| Accrued Management Fee | 306,666 | 98,336 | 208,330 | 91,666 |
| Due to/from Related Party | 0 | 0 | 0 | 0 |
| **OperatingLiabilities** | **894,220** | **1,150,179** | **-255,959** | **758,717** |
|  |  |  |  |  |
| Billings in Excess of Costs & Est Profit (TCL) | 1,482,058 |  |  | 4,428,112 |
| TCL Deferred Revenue (Partially Funded) | 85,000 |  |  | 0 |
| **Deferred Revenue** | **1,567,058** | **1,710,300** | **-143,241** | **4,428,112** |
|  |  |  |  |  |
| Fifth Street - Term Loan A | 9,500,000 |  |  | 9,500,000 |
| Fifth Street - Term Loan B | 4,505,000 |  |  | 4,902,500 |
| Fifth Street - Exit Fee | 296,000 |  |  | 296,000 |
| Term Loan A Quarterly Fee | 292,834 |  |  | 95,000 |
| Term Loan B Quarterly Fee | 150,391 |  |  | 51,725 |
| Term Loan A Amendment Fee | 47,446 |  |  | 0 |
| Term Loan B Amendment Fee | 24,641 |  |  | 0 |
| The Customer Link | 3,000,000 |  |  | 3,000,000 |
| RBC Bank | 11,301 |  |  | 16,684 |
| **Long Term Debt** | **17,827,614** | **17,168,500** | **659,114** | **17,861,909** |
|  |  |  |  |  |
| Term Loan A Current Interest & Loan Fees | 592,545 |  |  | 110,438 |
| Term Loan B Current Interest & Loan Fees | 381,388 |  |  | 59,458 |
| Term Loan B PIK Interest | 296,356 |  |  | 229,800 |
| The Customer Link Interest | 500,384 |  |  | 260,384 |
| **Accrued Interest** | **1,770,673** | **1,495,966** | **274,706** | **660,079** |
|  |  |  |  |  |
| Med Knowledge Investors I | 1,537,500 |  |  | 922,500 |
| Med Knowledge Investors II | 1,839,637 |  |  | 906,482 |
| Fifth Street | 236,797 |  |  | 154,264 |
| CHCE/Insight Interactive | 1,309,827 |  |  | 927,928 |
| The Customer Link | 2,464,627 |  |  | 1,186,074 |
| **Accrued Distributions** | **7,388,388** | **7,388,388** | **0** | **4,097,248** |
|  |  |  |  |  |
| Preferred Equity | 8,700,000 | 8,700,000 | 0 | 8,700,000 |
| Senior Preferred Equity | 1,500,000 | 1,500,000 | 0 | 1,500,000 |
| Common Equity/Retained Earnings | -12,312,984 | -6,863,186 | -5,449,798 | -6,335,776 |
| **Total Members Equity** | **-2,112,984** | **3,336,814** | **-5,449,798** | **3,864,224** |
|  |  |  |  |  |
| **TOTAL LIABILITIES & MEMBERS EQUITY** | **27,334,969** | **32,250,147** | **-4,915,178** | **31,670,289** |

## Schedule 4

- **Avalon Programs, LLC**

  1. 1825 Curve Crest Blvd. W., 3103, Stillwater, MN  55082

  2. 297 S. Century, Maplewood, MN  55119 (county-provided space)

  3. 7501 80th St. S., Cottage Grove, MN  55016

  4. 1230 Eagan Industrial Road, Ste 100, Eagan, MN  55121-1243 (shares space with Odyssey)

  5. 655 3rd St. S., Pine City, MN  55063 (month-to-month rental)

  6. 217 2nd St. N.W., Aitken, MN  56431 (county-provided space)

  7. 1586 West Hwy 55, Hastings, MN  55003 (county-provided space)

  8. 3329 University Ave, SE, Minneapolis, MN  55414

  9. 304 Laurel St., Brainerd, MN  55104 (county-provided space)

  10. 226 Minnesota Avenue North, Suite #3, Aitkin, MN

  11. 1885 University Ave, St. Paul, MN  55104

  12. 2800 University Ave SE, Minneapolis, MN  55414

- **Cedar Ridge Treatment Center LLC**

  1. 11400 Julianne Ave, Stillwater, MN  55082

- **Meadow Creek, LLC**

  1. 17305 Meadow Creek Lane, Pine City, MN  55063

- **Meridian Behavioral Health LLC**

  1. 500 Main Street, New Brighton, MN  55112

- **Odyssey Programs, LLC**

  1. 14300 County Road 62, Minnetonka, MN  55345 (county-provided space)

  2. 1586 and 1600 W. Hwy 55, Hastings, MN  55003 (county-provided space)

3. 1230 Eagan Industrial Road, Ste 100, Eagan, MN  55121-1243 (shares space with Avalon Behavioral Health LLC)

4. 1825 Curve Crest Blvd., Suite 103, Stillwater, MN  55082

- **<u>Tapestry Treatment Center LLC</u>**

  1. 1609 Jackson St., St. Paul, MN  55117

  2. 135 Colorado Street E., St. Paul, MN

- **<u>Twin Town Treatment Center, LLC</u>**

  1. 1706 University Ave, St. Paul, MN  55104

  2. 463 Aldine St., St. Paul, MN  55104

## Schedule 5

### Meridian Debtors

Gina Alexander -- Chief Financial Officer (since December 2010)

### MK Network Debtors

Jennifer Spear Smith -- Chief Executive Officer of TCL Institute, LLC (since November 2010)

George Glatz -- Chief Executive Officer of MedKnowledge Group, LLC (since April 2010)

<u>**Schedule 6**</u>

<u>**MK Network Debtors**</u>

MKG:

| | |
|---|---|
| Lisette Andre Cleary | Executive |
| Caren Henry-Glatcz | Marketing |
| Michael Leopold | Creative |
| Marlene Molinoff | Web |
| Derek Kaleida | Digital |

Total MKG   $26,000

TCL:

| | |
|---|---|
| David Griffith | IT |
| Todd Szuch | eCases |

Total TCL   $20,000

MKN:

| | |
|---|---|
| Lyle Raveling | Finance |

Total MKN   $13,750

Officers:

| | |
|---|---|
| George Glatcz | CEO, MKG |
| Jennifer Spears Smith | CEO, TCL |

Total Officers   $39,583

Total   $99,333

**Meridian Debtors**

Gina Alexander         CFO
Dave Gnass      Executive     Includes travel
Fran Sauvageau          Executive
Lisa Michie             Marketing
Sue Link               Business process
Julie Larish           IT
1543AD              Outsourced CIO
Advanced Practice Solutions
Medical Directors- Dr Aslam
Cal Appleby
Nany Ahrenholtz
Amy Dickerson
Karen Dickson
John Dow
Mary Evans
Tod Hecht
Robert Kelly
Richard Levine
George Lewis
Sherman Lightfoot
Marjorie Lundgren
Mary MacEachen
Nadine Peterson
Nurse Finders
Mary White
Interim HR

Total    201,720

# **Schedule 7**

**Consolidated Forecast:  Meridian and MK Network**
4 WEEK CASH FORECAST

| Week ending Saturday | 1<br>5-Mar | 2<br>12-Mar | 3<br>19-Mar | 4<br>26-Mar | Total |
|---|---|---|---|---|---|
| Cash, beginning of period | $ 2,137,842 | $ 1,932,558 | $ 1,438,948 | $ 1,727,710 | $ 2,137,842 |
| Accounts receivable collected | 494,599 | 105,962 | 563,671 | 298,984 | 1,463,217 |
| Cash Disbursements, Operating Expenses: | | | | | |
| Payroll | 82,205 | 376,514 | 0 | 355,014 | 813,733 |
| Payroll taxes | 86,405 | 13,000 | 86,405 | 13,000 | 198,810 |
| Employee Benefits | 110,866 | 0 | 0 | 0 | 110,866 |
| Rent / lease payments | 97,880 | 0 | 0 | 0 | 97,880 |
| Operating Expenses | 159,347 | 118,386 | 102,831 | 100,400 | 480,964 |
| Contract Services | 32,880 | 32,673 | 26,673 | 12,673 | 104,899 |
| Other Misc | 15,000 | 15,000 | 15,000 | 15,000 | 60,000 |
| American Express | 59,300 | 0 | 0 | 119,276 | 178,576 |
| Total Operating Expenses | 643,883 | 555,573 | 230,909 | 615,363 | 2,045,728 |
| Cash Disbursements, Other Expenses: | | | | | |
| Chapter 11 professional fees | 35,000 | 35,000 | 35,000 | 35,000 | 140,000 |
| Utility deposits | 12,000 | 0 | 0 | 0 | 12,000 |
| Other | 9,000 | 9,000 | 9,000 | 9,000 | 36,000 |
| Total Other Expenses | 56,000 | 44,000 | 44,000 | 44,000 | 188,000 |
| Net Cash Flow | (205,284) | (493,611) | 288,762 | (360,379) | (770,511) |
| Cash, End of Period | $ 1,932,558 | $ 1,438,948 | $ 1,727,710 | $ 1,367,331 | $ 1,367,331 |